UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RAGLAN GEORGE, JR., as Executive
Director of DISTRICT COUNCIL 1707,
AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO,

                                    Plaintiff,

            - against -

RONALD RICHTER, as Commissioner of
the ADMINSTRATION FOR CHILDREN'S
SERVICES OF THE CITY OF NEW YORK,
MICHAEL BLOOMBERG, as Mayor of the
CITY OF NEW YORK,

                                    Defendants.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 25, 2014

**MEMORANDUM
OPINION & ORDER**

11 Civ. 8648 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

> This action is brought by the executive director of District Council 1707 ("DC 1707"), American Federation of State, County and Municipal Employees ("AFSCME"), an umbrella labor organization that represents unionized employees who work for not-for-profit social services organizations, including Head Start programs and child day-care centers. Plaintiff asserts that Defendants – the Commissioner of New York City's Administration for Children's Services ("ACS") and former New York City Mayor Michael Bloomberg (collectively the "City") – interfered with DC 1707's right to collectively bargain under the National Labor Relations Act ("NLRA"). Specifically, the Complaint alleges that the City interfered with DC 1707's collective bargaining rights by (1) refusing to allow Plaintiff and third party organizations that represent day care and Head Start centers to negotiate a new collective bargaining agreement ("CBA"), and (2) issuing a Request for Proposals ("RFP") that seeks to re-design the way that

Head Start and day care centers are managed and operated in New York City, and which may result in unionized Head Start and day care centers not receiving contracts from the City.

The Complaint was filed on November 29, 2011. (Dkt. No. 1)  On September 20, 2013, this Court denied Plaintiff's motion for a preliminary injunction.  The City subsequently moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6). (Dkt. No. 33)  In an order dated March 31, 2014 (Dkt. No. 38), this Court denied Defendants' motion to dismiss under Rule 12(b)(1), but granted Defendant's motion under Rule 12(b)(6).  This opinion explains the reasons for the Court's decision.

## BACKGROUND

"In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)).  Accordingly, for the purposes of this motion, the following facts taken from the Complaint are accepted as true.

## I.      THE PARTIES

Plaintiff Raglan George, Jr., brings this suit in his capacity as the Executive Director of DC 1707, AFSCME. (Cmplt. ¶ 5)  DC 1707 is an umbrella labor union organization for local unions that represent employees working for not-for-profit social services agencies. Two of these local unions – Local 95 and Local 205 – represent employees of child care agencies. (Id. ¶¶ 5-7)  Local 95 represents employees at day care agencies that provide early childhood education services with funds allocated by the federal government to the City of New York under Project Head Start. (Id. ¶ 6)  Local 205 represents employees of day care agencies

that provide early childhood education services with federal funds allocated under certain block grants, as well as funds provided by the State of New York.  (Id. ¶ 7)

DC 1707 has entered into CBAs with the Head Start Sponsoring Board Council of the City of New York (the "Head Start Board") – a multi-employer bargaining agent that represents Head Start centers.  (Id. ¶ 9-10)  DC 1707 and the Head Start Board are parties to a CBA that ran from February 1, 2008 to January 31, 2011.  (Id. ¶ 10)

DC 1707 has also entered into CBAs with the Day Care Council of New York (the "DCC"), which represents day care centers.  (Id. ¶¶ 13-14)  DC 1707 and the DCC are parties to a CBA that ran from January 1, 2001 to March 31, 2006.  (Id. ¶ 14)

Defendants Michael R. Bloomberg and Ronald E. Richter were, at all relevant times, City officials.  (Id. ¶ 8)  Bloomberg is being sued in his official capacity as the former mayor of New York City.  Richter is being sued in his capacity as the Commissioner of ACS. (Id.)  ACS is a New York City agency that administers the Head Start and day care center programs.  (Id.)  Through its Office of Labor Relations ("OLR"), ACS must approve whatever CBAs DC1707 enters into with the Head Start Board and the DCC.  (Id. ¶ 11)

## II.    COLLECTIVE BARGAINING NEGOTIATIONS

### A.    Health Benefits

The City provides hospital and medical benefits to DC 1707 members employed in the Head Start and day care centers through its Central Insurance Program ("CIP").  (Id. ¶ 19) Employees receive additional health benefits under jointly administered employee benefit trust funds.  (Id. ¶¶ 20-22)  Trustees chosen by the unions (Local 95 and Local 205) and management (the Head Start Board and the DCC) oversee the trust funds, which are established pursuant to

3

Section 302(c)(5) of the Labor Management Relations Act (the "Taft-Hartley Act"), 29 U.S.C. § 186(c)(5).  (Id. ¶ 20)

In 2007 and 2008, DC 1707 negotiated with the DCC over a successor to the CBA that expired in March 2006.  In an October 2007 meeting, DCC representatives objected to the City's health benefit proposal, which would require that the DCC and the unions representing DCC employees agree that health benefits would be provided pursuant to a New York State plan called Family Health Plus.  (Id. ¶¶ 29-35)  During an April 2008 meeting with the City, DC 1707 told the City that it preferred that all health benefits for day care and Head Start employees be provided through the unions' welfare funds.  (Id. ¶¶ 41, 46)  In June 2008, City representatives told DC 1707 that the City would not agree to have health benefits provided through the union welfare plans.  (Id. ¶¶ 49-52)  In July 2008, City representatives advised DC 1707 that moving employees into the Family Health Plus plan was no longer feasible.  (Id. ¶ 55)  When the complaint in this action was filed on November 29, 2011, the City and DC 1707 were still at an impasse concerning how health benefits should be provided to day care workers; at all times, the City remained opposed to having health benefits provided through the unions' welfare funds. (Id. ¶ 164)

### B.     COLA Increases

Funding for the Head Start program is provided to ACS by the United States Department of Health and Human Services ("HHS").  (Id. ¶ 12)  Each year, HHS determines what is known as a Cost of Living Adjustment (COLA), i.e. the amount of money the City will receive from HHS for annual salary and benefit increases for Head Start employees.  (Id.)  The Head Start CBA is frequently delayed because the parties must first wait for HHS to set the COLA.  (Id.)  The City has limited discretion over the COLA – it may only determine whether a

portion of the COLA will be paid as wages or spent on other benefit or contractual enhancements.  (Id.)

The City would not agree to fund COLA increases for employees at DCC-day care centers unless DC 1707 agreed to have its members receive health benefits through Family Health Plus or another plan of the City's choosing.  (Id. ¶ 162)  While the Complaint does not specify when the COLA for fiscal year 2007 was set, the relevant contractual negotiations among the DCC, DC 1707 and the City occurred between March 2007 and July 2008.  (Id. ¶¶ 28-59)  After July 2008, the City did not set a date for future negotiations nor did it "advise the DCC what level of funding it was willing to provide for collective bargaining purposes."  (Id. ¶ 59)  Because "[t]he City did not agree to provide COLA increases," Plaintiff could not engage in collective bargaining negotiations with the DCC.  (Id. ¶ 60-61)  Plaintiff further alleges that the City discriminated against its union members by denying them COLA increases while providing the same increases to non-union vendors in May 2008.  (Id. ¶¶ 62-63)

## III.    THE CITY'S REQUEST FOR PROPOSALS

On April 2, 2008, ACS issued a concept paper regarding its plan to merge funding streams available for early childhood education into one program called EarlyLearnNYC.  (Id. ¶ 108)  On May 23, 2011, ACS issued an RFP for the EarlyLearnNYC program.  (Id. ¶ 112)  The RFP sets forth the per child rates that the City will pay to contract vendors.  (Id. ¶ 114)  The RFP further provides that ACS will terminate the current contracts of Head Start and day care centers and issue new contracts once it determines which bidders will receive contracts under the EarlyLearnNYC program.  (Id. ¶ 115)  The rates proposed in the RFP do not provide sufficient funding for the current cost of health benefits.  (Id. ¶ 122)

Following the issuance of the RFP, DC 1707 continued to request a meeting with City officials, so that it would be able to conclude its collective bargaining negotiations with the Head Start Board and the DCC.  (Id. ¶ 142)  According to Plaintiff, New York's Deputy Mayor for Health and Human Services directed ACS and OLR officials not to meet with DC 1707 or with representatives of the Head Start Board and the DCC.  (Id. ¶ 144)

Plaintiff cites to a number of public statements made by City officials indicating that the City wishes to implement a new program for Head Start and day care in order to reduce health care costs.  (Id. ¶¶ 39, 81, 155-60)  For example, in testimony before a New York State Senate committee regarding the Early Learn program, an ACS official – Sara Vechiotti – stated that "steadily increasing health-insurance costs do comprise a significant portion of the child-care deficit. . . . [C]ontinuing the current health-insurance structure is, unfortunately, not an option that we can continue at this time, in order to make sure that as many children are served as possible in Early Learn."  (Declaration of Luz Santiago in Support of Motion for Preliminary Injunction, Ex. G (Dkt. No. 9) Tr. at 36)

## IV.    THE COMPLAINT

The Complaint alleges that the City interfered with DC 1707's right to collectively bargain pursuant to the NLRA, unfairly discriminated against unionized day care employees, and improperly sought to regulate labor relations.  (Cmplt. ¶¶ 162-171)  Plaintiff contends, for example, that the City improperly refused to provide the COLA increases unless and until DC 1707 would agree to have its members receive health insurance through the Family Health Plus plan.  (Cmplt. ¶ 162)  Plaintiff also asserts that the City refused to permit collective bargaining negotiations over health and welfare benefits to proceed, thereby "preventing unionized centers from being able to compete under the RFP."  (Id. ¶ 169)

The Complaint asserts two federal claims and two state law claims. Plaintiff's first cause of action alleges that the City violated 42 U.S.C. § 1983 by interfering with Plaintiff's right, as guaranteed by the NLRA, to engage in collective bargaining free from government interference. The second cause of action also alleges a violation of Section 1983, but on the grounds that the City has improperly sought to regulate labor relations in violation of the NLRA. Plaintiff's third cause of action asserts that the four-year contract term included in the City's RFP violates 18 N.Y.C.R.R. § 405(e)(1), which requires local social service districts that receive New York Child Care Block Grants to annually renew childhood education contracts. (Id. ¶¶ 117-18) Finally, Plaintiff asserts that the City has violated N.Y. Soc. Serv. Law § 410-X(4), which requires social service districts to establish rates that cover the actual costs of child care assistance. (Id. ¶ 119, 175)

## V.   **PROCEDURAL HISTORY**

The Complaint was filed on November 29, 2011. (Dkt. No. 1) On April 24, 2012, Plaintiff moved for a preliminary injunction, seeking an order that would have enjoined the City "from implementing or otherwise acting to effectuate the program described in [ACS's] May 23, 2011 [RFP]." (Notice of Motion (Dkt. No. 7))

After a hearing, this Court denied Plaintiff's motion for a preliminary injunction. (Dkt. No. 18) Plaintiff then sought an emergency injunction from the Second Circuit. (Dkt. No. 20) On February 25, 2013, the Second Circuit dismissed the appeal as moot, because the action that Plaintiff sought to enjoin – implementation of the RFP for the EarlyLearn NYC program – had already occurred. (Dkt. No. 26) The panel noted, however, that the "underlying controversy is not moot," and therefore remanded so that this Court could determine "all issues regarding claims that remain pending." (Id.)

After remand, the City filed the instant motion to dismiss.

## VI.    THE CITY'S MOTION TO DISMISS

The City argues that this action must be dismissed because:

(1) the Complaint is moot, given that the City has already awarded contracts pursuant to the RFP and Plaintiff subsequently entered into a three-year CBA with the Head Start Board;

(2) this Court lacks subject matter jurisdiction, because (i) a local government such as the City is not subject to the NLRA, and (ii) the National Labor Relations Board has original, exclusive jurisdiction over Plaintiff's claims;

(3) the Complaint does not state a Section 1983 claim because it fails to allege that Plaintiff's rights were violated as a result of a municipal policy, practice or custom;

(4) Plaintiff's first cause of action, which pertains to the City's purported refusal to fund a COLA increase, is time-barred;

(5) Plaintiff's second cause of action, which accuses the City of unlawfully regulating labor relations and interfering with Plaintiff's right to collectively bargain, fails to state a claim because the City was acting in its proprietary capacity as a market participant; and

(6) this Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, given that no valid federal claim exists.

(Def. Br. (Dkt. No. 34) at 5-10)

## DISCUSSION

## I.    LEGAL STANDARD

A claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  When subject matter jurisdiction is challenged, a plaintiff "bear[s] the burden of 'showing by a preponderance of the evidence that subject matter jurisdiction exists.'"  APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (quoting

Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003)).  In deciding a motion to dismiss for lack of subject matter jurisdiction, "a district court . . . may refer to evidence outside the pleadings." Makarova, 201 F.3d at 113 (citing Kamen v. AT & T Co., 791 F.2d 1006, 1011 (2d Cir. 1986)).

A Rule 12(b)(6) motion challenges the legal sufficiency of the claims asserted in a complaint.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  To meet this standard, a complaint's factual allegations must permit the Court, "draw[ing] on its judicial experience and common sense," "to infer more than the mere possibility of misconduct." Id. at 679.  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty, 282 F.3d at 87), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

"'Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues before considering whether a claim is stated in the complaint.'" Raghavendra v. N.L.R.B., 08CIV8120PACHBP, 2009 WL 5908013, at *7 (S.D.N.Y. Aug. 27, 2009) (quoting Sunrise Indus. Joint Venture v. Ditric Optics, Inc., 873 F. Supp. 765, 769 (E.D.N.Y. 1995)).

## II.    MOOTNESS

Defendants argue that the claims made in the Complaint are now moot, because the injury complained of – interference with Plaintiff's right to collectively bargain – no longer exists.  "To invoke the jurisdiction of a federal court, a litigant must have suffered, or be

threatened with, an actual injury traceable to the defendant and likely to be redressed by a

favorable judicial decision." Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990) (internal

citations omitted). "[I]t is not enough that a dispute was very much alive when suit was filed, or

when review was obtained in the Court of Appeals." Id. at 477-78. "The parties must continue

to have a 'personal stake in the outcome' of the lawsuit." Id. at 478 (quoting Los Angeles v.

Lyons, 461 U.S. 95, 101 (1983) (internal quotation marks and citation omitted)).

On September 20, 2012, this Court denied Plaintiff's motion for a preliminary

injunction that would have enjoined Defendants from awarding contracts pursuant to the RFP.

(Dkt. No. 18)  The City subsequently awarded contracts in conformance with the RFP.  Shortly

thereafter, Plaintiff entered into a new CBA with the Head Start Board that covers the period

from February 1, 2013 to January 30, 2015.  (Declaration of Daniel Chiu, Ex. C (Dkt. No. 33))

The City argues that DC 1707 has "received the precise relief" that it sought, and this Court

should therefore dismiss the Complaint.  (Def. Br. (Dkt. No. 34) at 10)

It is true that certain claims for relief have been overtaken by subsequent events.

For example, the Complaint seeks an injunction prohibiting the City from implementing the

RFP, and an order requiring ACS to permit the Head Start Board and DC 1707 to collectively

bargain over health insurance benefits.  (Cmplt. at 27)  Given that the RFP has been

implemented, and that Plaintiff and the Head Start Board have entered into a CBA, claims for

relief concerning these matters are moot.

Other claims for relief have not been rendered moot by subsequent events,

however.  For example, the City has not asserted that there is now a CBA between DC 1707 and

the DCC.  This Court concludes that the following claims for relief all present live issues capable

of redress:  (1) Plaintiff's request for an order compelling ACS to release funding for COLA

increases for 2008 – 2010 so that the DCC and DC 1707 can engage in meaningful collective bargaining; (2) Plaintiff's request for an order requiring ACS to permit DCC and DC 1707 to collectively bargain over health insurance benefits; (3) a permanent injunction preventing the City from interfering with the rights of DC 1707 members to collectively bargain; and (4) attorneys' fees and costs.

Accordingly, the City's motion to dismiss on mootness grounds will be granted as to the request for (1) an injunction concerning implementation of the RFP, and (2) an order requiring ACS to permit the Head Start Board and DC 1707 to collectively bargain for health insurance benefits, but will otherwise be denied.

## III.    SUBJECT MATTER JURISDICTION

The City raises two challenges to this Court's subject matter jurisdiction.  First, it argues that because municipal entities are exempt from the NLRA's reach, Plaintiff's Section 1983 claims are barred.  (Def. Br. (Dkt. No. 34) at 5)  Second, it asserts that Plaintiff's federal claims are preempted by Sections 7 and 8 of the NLRA, 29 U.S.C. § 151 et seq.  (Id. at 8)

The City's first contention misconstrues the nature of the Complaint.  Plaintiff does not allege that that the City is liable because it violated the NLRA.  Indeed, Plaintiff readily concedes that the City is exempt from the NLRA's reach.  (Pltf. Opp. (Dkt. No. 37) at 4)  Rather, Plaintiff asserts that the City interfered with its federal statutory right to collectively bargain, thus violating the due process rights of union members.  (Cmplt. ¶¶ 163-64, 166)  Moreover, the City's assertion that this Court lacks jurisdiction under Section 1983 under the circumstances here is contrary to clearly established law.  See Golden State Transit Corp. v. City of Los Angeles ("Golden State II"), 493 U.S. 103, 109 (1989) (where a plaintiff "is the intended beneficiary of a statutory scheme that prevents governmental interference with the collective-

bargaining process . . . the NLRA gives it rights enforceable against governmental interference in an action under § 1983").

The City's pre-emption argument also fails under well-settled law. Section 1983 provides a remedy whenever a person acting under color of state law violates a federal statutory or constitutional right. 42 U.S.C. § 1983. The Supreme Court has repeatedly advised that "the [remedial] coverage of th[is] statute must be broadly construed." Golden State II, 493 U.S. at 105 (citations omitted). The Court has also explained that Section 1983 "provides a remedy 'against all forms of official violation of federally protected rights.'" Id. at 106 (quoting Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 700–701 (1978)).

Golden State II sets forth a two-part test for determining the validity of a Section 1983 claim. First, the Court must determine whether plaintiff has asserted the deprivation of a federal constitutional or statutory right. Id. (citing Middlesex County Sewerage Authority v. National Sea Clammers Assn., 453 U.S. 1, 19 (1981)). If plaintiff has adequately alleged such a deprivation, the burden shifts to the defendant to show that "Congress specifically foreclosed a remedy under § 1983, by providing a comprehensive mechanism for protection of a federal right." Id. (internal citations, quotation marks and alterations omitted).

Here, Plaintiff has asserted the deprivation of a federal statutory right, and the Supreme Court has already determined that the statute in question does not provide a comprehensive remedial scheme as to acts of governmental interference such as that alleged here. Golden State II, 493 U.S. at 108 ("Although the National Labor Relations Board . . . has exclusive jurisdiction to prevent and remedy unfair labor practices by employers and unions, it has no authority to address conduct protected by the NLRA against governmental interference.").

Accordingly, the City's motion to dismiss Plaintiff's federal claims for lack of subject matter jurisdiction will be denied.

## IV.    MUNICIPAL POLICY, PRACTICE OR CUSTOM

The City argues that Plaintiff's Section 1983 claims must be dismissed under Rule 12(b)(6) because DC 1707 has not alleged that its members' rights were violated as the result of a municipal policy, practice or custom. (Def. Br. (Dkt. No. 34) at 9) "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." Connick v. Thompson, __U.S.__, 131 S. Ct. 1350, 1359 (2011) (quoting Monell, 436 U.S. at 691). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Id. "The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." Pembaur v. City of Cincinnati, 475 U.S. 469, 481-82 (1986) (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822-24 (1985)). "The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." Id. at 482-83.

The Complaint clearly implicates a municipal policy. The Complaint alleges that (1) ACS refused to provide funding to the DCC-day care centers so as to coerce DC 1707 into agreeing to have its members covered by the New York State Family Health Plus plan or a similar health plan; and (2) ACS's RFP prevented Plaintiff from exercising its collective bargaining rights and unfairly discriminated against unionized employees. As the head of ACS, Commissioner Richter is unquestionably a policy-making official. Viewed in the light most favorable to Plaintiff, the Complaint alleges that ACS – concerned about health care costs –

refused to inform DC 1707 and the DCC of the level of funding that would be made available for day care centers, thereby impeding their efforts to collectively bargain. (Cmplt. ¶¶ 28, 59-61) The Complaint further alleges that, beginning in 2008, ACS decided to combine the state and federal funding streams for early childhood education into one program known as EarlyLearn NYC. (Cmplt. ¶ 108) In furtherance of that plan, the Complaint alleges that ACS issued an RFP in May 2011 that set forth the rates the City would pay to child care providers. (Id. ¶ 112)

The actions taken by ACS clearly fit within the definition of a municipal policy. See Pembaur, 475 U.S. at 480-81 ("'[O]fficial policy' often refers to formal rules or understandings – often but not always committed to writing – that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time."). The City's decision to seek health care benefit concessions from union officials, and ultimate decision to terminate its contracts with existing childhood education providers in favor of a unified program – reflect choices from a range of policy options. Tuttle, 471 U.S. at 823 ("[T]he word 'policy' generally implies a course of action chosen from among various alternatives.").

Finally, Plaintiff has adequately alleged that the City's refusal to fund COLA increases and its decision to issue the RFP caused the deprivation of Plaintiff's federal statutory rights. (See Cmplt. ¶¶ 166-67, 170)

The City's motion to dismiss for failure to allege municipal liability will be denied.

## V.   STATUTE OF LIMITATIONS

The City moves to dismiss Plaintiff's first cause action as time-barred. In the first cause of action, Plaintiff alleges that the City (1) interfered with its collective bargaining rights

under the NLRA by withholding COLA increases for the DCC centers until Plaintiff agreed to

have its members receive health insurance benefits through a state plan (Cmplt. ¶¶ 162-63), and

(2) refused to permit the parties to the CBAs to negotiate their own health benefits plans.  (Id. ¶

164)  The City argues that DC 1707 must have known of its claim no later than March 12, 2008,

since on that date it filed another lawsuit in this District that raised a nearly identical claim with

respect to the Head Start centers.[1]  (See Def. Reply Br. (Dkt. No. 35) at 3)

      "'A motion to dismiss on statute of limitations grounds is properly viewed as a

Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.'"

Jowers v. Lakeside Family & Children's Svcs., 435 F. Supp. 2d 280, 283 (S.D.N.Y. 2006)

(quoting Marbi Corp. of New York v. Puhekker, 9 F. Supp. 2d 425, 426 (S.D.N.Y. 1998)).

"Since Congress did not enact a statute of limitations governing actions brought under § 1983,

. . . courts must borrow a state statute of limitations." Lounsbury v. Jeffries, 25 F.3d 131, 133

(2d Cir. 1994) (citing Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 462 (1975)).

"The statute of limitations for an action arising in New York pursuant to 42 U.S.C. § 1983 is

borrowed from New York's general statute of limitations for personal injury actions." Blankman

v. Cnty. of Nassau, 819 F. Supp. 198, 206 (E.D.N.Y. 1993) aff'd, 14 F.3d 592 (2d Cir. 1993).

Under New York law, the limitations period for such actions is three years.  N.Y. C.P.L.R. §

214(5); see also Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004) ("The

statute of limitations applicable to claims brought under §§ 1981 and 1983 in New York is three

years.").

---

[1] That lawsuit was dismissed with prejudice on October 7, 2009.  See Order of Dismissal (Dkt. No. 27), George v. Mattingly, 08 Civ. 2500 (RJS) (S.D.N.Y.).

Federal law, however, determines the date when a Section 1983 claim accrues. Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980). Under federal law, a claim accrues "'when the plaintiff knows or has reason to know of the injury which is the basis of [its] action.'" Id. (quoting Bireline v. Seagondollar, 567 F.2d 260, 263 (4th Cir. 1977)). "The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." Id. at 192.

Plaintiff argues that it "did not know it had a cause of action until City officials refused to meet DC 1707 and the employers following the introduction of the RFP after numerous requests to discuss health insurance issues, which occurred in 2011." (Pltf. Opp. Br. (Dkt. No. 37) at 6)  Plaintiff does not acknowledge, much less attempt to explain, the nearly identical complaint it filed on March 12, 2008.  The 2008 action and the instant complaint differ only in that (1) the instant complaint alleges that the COLA increases were not provided to the DCC, while the 2008 complaint concerns only the Head Start Board (Compare Cmplt. (Dkt. No. 1) ¶¶ 162-63, 11 Civ. 8648 with Cmplt. (Dkt. No. 1) ¶¶ 22-23, 08 Civ. 2500), and (2) the instant complaint asserts that the City interfered with Plaintiff's collective bargaining rights by not permitting the parties to negotiate health benefits, whereas the 2008 complaint does not include this allegation.  (Cmplt. (Dkt. No. 1) ¶ 164, 11 Civ. 8648)

"'In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" Hendrix v. City of New York, 12 CV 5011 ILG CLP, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (quoting Serdarevic v. Centex Homes, LLC, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010)). "'A court may take judicial notice of a document filed in another court not for

16

the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) (quoting Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998)).

   DC 1707 and the DCC began negotiating a successor CBA in or about April 2006. (Cmplt. ¶ 26)  Initially, the parties discussed only non-economic terms, because the City had not disclosed what level of funding would be made available for collective bargaining. (Id. ¶ 27)  On May 7, 2007, New York City's Commissioner of Labor Relations told the parties that the City did not know what level of funding would be made available for "purchase service vendors," i.e., agencies, like child care centers, that contract with the City to provide social services. (Id. ¶ 28)  At an October 30, 2007 meeting, the City advised the parties of the proposed COLA increases. (Id. ¶¶ 29-33)  At that same meeting, ACS representatives introduced the City's health benefit proposal, which would have required the DCC and DC 1707 to agree to use the State's Family Health Plus plan. (Id. ¶¶ 29-35)

   In later meetings with the City in early 2008, the DCC and DC 1707 instead proposed to fund health benefits through their own jointly administered welfare funds, a proposal that the City opposed. (Id. ¶¶ 46, 49, 50)  On March 12, 2008, DC 1707 filed its earlier complaint, alleging that the City had refused to provide the COLA funding increases to DC 1707 and the Head Start Board. (Cmplt. (Dkt. No. 1) ¶¶ 22-23, 08 Civ. 2500)  In May 2008, the City provided the COLA increases to non-unionized Head Start centers. (Cmplt. ¶ 62, 11 Civ. 8648)  In or about July 2008, the City informed Plaintiff that moving employees into the Family Health Plus plan would not be feasible. (Id. ¶ 55)  After July 2008, the City refused to meet with DC 1707 or the DCC. (Id.)  On December 15, 2008, DC 1707's general counsel sent a letter to OLR

17

reiterating DC 1707's proposal that health insurance be provided through the jointly administered union welfare funds. (Id. ¶ 56)  The City did not agree to the proposal. (Id. ¶ 58)  Sometime before October 7, 2009 – when DC 1707 dismissed its first lawsuit against ACS with prejudice – DC 1707 and the Head Start Board entered into a new CBA that was to run from February 1, 2008 through January 31, 2011. (Id. ¶ 10)  Plaintiff and the DCC have apparently not entered into a similar agreement.

Given these facts, this Court concludes that Plaintiff's first cause of action – set forth in the November 29, 2011 Complaint (Dkt. No. 1) – is time-barred.  The record demonstrates that Plaintiff was aware of its claim regarding the City's failure to fund the COLA increases no later than March 12, 2008, when it filed a complaint containing an identical allegation regarding Head Start centers.  Moreover, to the extent Plaintiff's first cause of action is predicated on discriminatory treatment, Plaintiff knew or had reason to know of its injury by May 2008, when the City funded COLA increases for non-unionized Head Start centers.

Plaintiff's argument that it did not know, or have reason to know, until 2011 that the City would not permit it to negotiate its own health care agreements with the DCC and Head Start Board is not persuasive.  (Pltf. Opp. Br. (Dkt. No. 37) at 6)  The Complaint makes clear that Plaintiff knew, at least by June 2008, that the City would not agree to have health benefits provided through union welfare plans.  That Plaintiff might have hoped that City officials would change their minds is of no consequence.

The substance of Plaintiff's claim is that the City interfered with the collective bargaining process by refusing to consent to the use of union welfare benefit plans.  The Complaint pleads that on June 10, 2008, "OMB representatives" told DC 1707 that the City would not agree "to having benefits . . . provided through the union welfare plans." (Id. ¶ 50)

18

The Complaint thus acknowledges that Plaintiff knew – at least by June 10, 2008 – that the City was impeding its ability to collectively bargain by refusing to permit the parties to negotiate for health care benefits to be provided through the unions' own welfare plans.  Given that the Complaint was not filed until November 2011, the first cause of action is time-barred.

Accordingly, the City's motion to dismiss Plaintiff's first cause of action will be granted.

## VI.    THE MARKET PARTICIPANT EXCEPTION

The crux of Plaintiff's second cause of action is that the City – by intruding on the collective bargaining process between DC 1707 and the DCC and Head Start employers as it related to health benefits – improperly attempted to regulate an area that has been preempted by federal labor law.

The City argues that it did not use its regulatory authority to improperly interfere with private labor negotiations in contravention of Plaintiff's rights under the NRLA.  The City contends that, instead, it was acting "on a proprietary basis, that is, as an actor in the marketplace." (Def. Br. (Dkt. No. 34) at (citing Bldg. & Constr. Trades Council of the Metro. Dist. v. Assoc. Builders & Contractors, 507 U.S. 218 (1993) ("Boston Harbor")).

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678.  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.  Moreover, "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

19

Plaintiff's allegation that the City's actions amount to regulation of labor relations is a legal conclusion that is "not entitled to the assumption of truth." Id.  Accordingly, the central question is whether Plaintiff's legal conclusion is sufficiently supported by well-pled factual allegations.  Id.

"The Supreme Court '"has articulated two distinct NLRA preemption principles."'" Legal Aid Society v. City of New York, 114 F. Supp. 2d 204, 235 (S.D.N.Y. 2000) (quoting Boston Harbor, 507 U.S. at 224 (quoting Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 748 (1985))):

> The first principle, known as "Garmon preemption," prohibits state and local regulation of activities that the NLRA arguably protects or prohibits, as a means of preserving the "'integrated scheme of regulation'" embodied in the NLRA and administered exclusively by the National Labor Relations Board.  Boston Harbor, 507 U.S. at 224–25 (quoting San Diego Building Trades Council v. Garmon, 359 U.S. 236, 247 (1959)).  The second principle, known as "Machinists preemption," forbids state and local regulation of "areas that have been left 'to be controlled by the free play of economic forces,'" as a means of preserving Congress' "'intentional balance'" of bargaining power between management and labor.  Id. at 225–26 (quoting Machinists v. Wisconsin Emp't Relations Comm'n, 427 U.S. 132, 147 (1976)).

Id.

"'[P]re-emption doctrines [however,] apply only to state regulation.'" Building Industry Elec. Contractors Ass'n v. City of New York, 678 F.3d 184, 187-88 (2d Cir. 2012) (quoting Boston Harbor, 507 U.S. at 227) (emphasis in Boston Harbor).  In other words, "these principles do not require the preemption of otherwise lawful activity undertaken by a state or municipality acting in a proprietary capacity, since such activity implicates the government's role as a purchaser and market participant rather than as a regulator." Legal Aid Society, 114 F. Supp. 2d at 235 (citing Boston Harbor, 507 U.S. at 229, 232).  The Second Circuit has recognized that "[a] major limitation on the labor law preemption doctrines is the principle that

20

state conduct will not be preempted if the state's actions are proprietary, rather than regulatory . . . . 'In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction.'" Healthcare Ass'n of New York State v. Pataki, 471 F.3d 87, 108 (2d Cir. 2006) (quoting Boston Harbor, 507 U.S. at 231-32).

   Here, the Complaint's factual allegations – even when viewed in the light most favorable to Plaintiff – do not raise a plausible inference that the City was acting beyond its proprietary interest as a market participant.  Instead, the City's alleged actions – both as to the RFP and its interference with collective bargaining over health benefits – place the City well within the "market participant" exception.  In the words of Healthcare Ass'n, the "challenged action essentially reflect[s] the [City's] own interest in its efficient procurement of needed goods and services." Id. at 109 (quoting Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686, 693 (5th Cir. 1999)).

   Legal Aid Society, 114 F. Supp. 2d 204, is instructive.  In that case, the Legal Aid Society and unions representing legal staff alleged that the City had violated their state and federal rights by interfering with an ongoing labor dispute.  The unionized lawyers at Legal Aid had gone on strike, and the City, in response, had issued RFPs soliciting bids for municipal contracts for the provision of legal services.  In two of the RFPs, the City explicitly prohibited the Legal Aid Society from responding to the RFP.  The court found that the City's actions were proprietary and were not preempted by the NLRA. Legal Aid Society, 114 F. Supp. 2d at 239 ("In the present case, the City has not attempted to regulate all attorneys practicing within the legal services market, and has not attempted to exclude Legal Aid from that market altogether,

21

but has only attempted to restructure its relationship with Legal Aid in an effort to minimize possible disruptions in the provision of legal services.").

Plaintiff argues that the <u>Boston Harbor</u> exception, which the <u>Legal Aid</u> court relied on, is not applicable here because that exception does not "permit a state actor to regulate under the guise of its spending power when doing so interferes with the bargaining process that Congress intended be left to the exclusive jurisdiction of the National Labor Relations Board." (Pltf. Opp. Br. (Dkt. No. 37) at 7)  According to Plaintiff, the City is acting as a regulator here, with an interest in setting policy, and not as a market participant.  (Pltf. Opp. Br. (Dkt. No. 37) at 8) ("The reasonable inference the Court should draw from this is that the City intended the RFP to regulate labor relations in a way more to its liking.")

Plaintiff's factual allegations demonstrate, however, that the City is implementing the EarlyLearn program as part of an effort to obtain cost savings in those child care programs it funds either directly or indirectly as a conduit for Federal and state funds.  (Cmplt. ¶¶ 23, 25, 39, 120, 122, 123)  Plaintiff does not allege that the City is attempting to regulate all child care in the City, nor does Plaintiff allege that the City is attempting to exclude unionized day care centers from participating in the new program.  The City is simply restructuring its relationship with day care providers as part of a broader effort to achieve cost savings.  As the ACS official stated in her testimony to a State Senate Committee, "steadily increasing health-insurance costs do comprise a significant portion of the child-care deficit. . . . [C]ontinuing the current health-insurance structure is, unfortunately, not an option that we can continue at this time, in order to make sure that as many children are served as possible in Early Learn."  (Santiago Decl. (Dkt. No. 9), Ex. G, Tr. at 36)

"Congress did not intend states' [or city's] decisions about how to spend their own money as participants in the labor market to be subject to the same scrutiny as state [or city] regulation of the private labor market." See Building Industry Elec. Contractors Ass'n, 678 F.3d at 187-88. The fact that the City's "proprietary actions in this case may have incidental effects on labor in the [child care] market does not, by itself, alter this outcome." Legal Aid Society, 114 F. Supp. 2d at 239. "The Supreme Court has 'held consistently that the NLRA was intended to supplant state labor regulation, not all legitimate state activity that affects labor.'" Id. (quoting Boston Harbor, 507 U.S. at 227). Here, the City's actions – whether in issuing the RFP or allegedly influencing the collective bargaining process by not agreeing to the unions' proposal for the delivery of health benefits – may affect labor, but the City has deemed these measures necessary to achieve necessary cost savings. The law permits municipalities to take such steps as market participants.

As for Plaintiff's argument concerning the City's purpose in adopting the RFP, the Second Circuit has explained that "when a court assesses whether a governmental policy has a regulatory purpose, it looks primarily to the objective purpose clear on the face of the enactment, not to allegations about individual officials' motivations in adopting the policy." Building Industry Elec. Contractors Ass'n, 678 F.3d at 191. Accordingly, a court "will not search for an impermissible motive where a permissible purpose is apparent, because '[f]ederal preemption doctrine evaluates what legislation does, not why legislators voted for it or what political coalition led to its enactment.'" Id. (quoting N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin, 431 F.3d 1004, 1007 (7th Cir. 2005)) (emphasis in original). Courts' hesitancy to engage in motive-based inquiries concerning legislative behavior is driven by separation of powers concerns. See id. (quoting Vill. of Arlington Heights v. Metro Hous. Dev.

23

Corp., 429 U.S. 252, 268 (1977) ("Judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government.")).

As discussed above, the City's RFP reflects its interest in, inter alia, efficiently procuring services from qualified early childhood education and day care providers.  In furtherance of that interest, the RFP establishes a rate-based system that compensates providers on the basis of the number of children they serve.  (Declaration of Eamonn F. Foley, Ex. A (Dkt. No. 36) at 3, 6)  The RFP further provides for a competitive bidding process in which contracts are awarded – at least in part -- according to objective, predetermined "evaluation criteria."  (Id. at 41)  Given this record, Plaintiff's conclusory allegation regarding the City's purported regulatory purpose does not "permit an elaborate inquiry into individual governmental officials' motivations."  Building Industry Elec. Contractors Ass'n, 678 F.3d at 191.

Because Plaintiff's factual allegations do not create a plausible inference that the City acted improperly, the City's motion to dismiss Plaintiff's second cause of action will be granted.

## VII.   PENDENT STATE LAW CLAIMS

Title 28 U.S.C., Section 1367 provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy."  A claim is "so related" to those within a court's original jurisdiction when it "derive[s] from a common nucleus of operative fact," such that a party "would ordinarily be expected to try them all in one judicial proceeding." Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir.2003) (internal quotation marks and citations omitted).

A district court may decline to exercise supplemental jurisdiction, however, where all claims arising under its original jurisdiction have been dismissed. 28 U.S.C. § 1367(c)(3). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' in deciding whether to exercise jurisdiction." Kolari v. New York–Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (citing Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343 (1988)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Cohill, 484 U.S. at 350 n.7.

Having dismissed Plaintiff's federal claims, this Court finds that the balance of factors weighs against exercising jurisdiction over Plaintiff's remaining state law claims. Accordingly, the City's motion to dismiss the pendent state law claims will be granted without prejudice.

## CONCLUSION

This Court's March 31, 2014 order (Dkt. No. 38) denying Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(1), and granting Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6), was issued for the reasons stated above. The Clerk of the Court is directed to close this case.

Dated: New York, New York
     April 25, 2014

                            SO ORDERED.

                            _____
                            Paul G. Gardephe
                            United States District Judge